Filed 8/14/14  P. v. Mendez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN ABDIEL MENDEZ,<br><br>    Defendant and Appellant. | B253578<br><br>(Los Angeles County<br>Super. Ct. No. BA402130) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Ruderman Feuer, Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

———————————————

Defendant and appellant, Jonathan Abdiel Mendez, appeals from the judgment entered following a jury trial which resulted in his conviction of second degree robbery (Pen. Code, § 211)[1] and his admission he previously had suffered a sustained juvenile adjudication in which it was found he had committed the serious or violent felony of robbery within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  The trial court sentenced Mendez to six years in state prison.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1.  *Facts.*

  a.  *The prosecution's case*.

At approximately 11:45 a.m. on September 3, 2012, Jaime Pablo was walking southbound on Irolo Street from 8th Street, toward San Marino.  Pablo was by himself.

Mendez and a companion were walking toward Pablo and, when they reached him, Mendez walked on the left side of Pablo while his companion approached Pablo from the right side.  Mendez took hold of Pablo's shoulder and Mendez's cohort, who was holding a knife, grabbed Pablo on the right side of his shirt.  Mendez and his companion then told Pablo to give to them "everything [he] had."[2]  Pablo told the two men the only thing he had was the gold chain with a pendant he was wearing around his neck.[3]  Mendez then "yanked" the chain from Pablo's  neck.  Pablo attempted to grab the knife from Mendez's companion but was unsuccessful and, in making the attempt, cut two of his fingers.  After Pablo was unable to obtain the knife, Mendez punched him "with his fist" on the "left side of his head" while the other man kicked him on his chest with his foot.  When Pablo then lost his balance and fell back into some bushes, Mendez and the second man "took off running."

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Mendez's partner apparently said, "Give me everything you've got, don't do anything or I'll shank you."

[3] Pablo estimated the chain and pendant were worth $700.

As Mendez and his companion ran off, Pablo got up, took off his belt, believing he could somehow use it to recover his chain, and chased after them. The two men ran together for about a block, then made a left at an intersection. Pablo, who had been unable to keep up with Mendez and the second man, nevertheless saw them turn the corner and, when he reached the intersection, he saw a "patrol car." Pablo yelled out to the officers inside the car that Mendez and his companion had just robbed him, then continued to chase the two men. The officers turned their car around and followed Mendez and his companion. By this time, Mendez and the other man had split up and, as Mendez was the individual closest to the police car, the officers continued to follow him. The officers caught up with Mendez after he stopped running and bent down behind a car parked just past the intersection of San Marino and Normandie.

Two officers got out of the patrol car and took Mendez into custody. As they were doing so, a second patrol car pulled up and parked. After interviewing Pablo, one of the officers walked back along the route Mendez and his companion had taken and found a knife on the ground. Pablo recognized the knife as the same one Mendez's cohort had used during the altercation.

Los Angeles Police Department Officer Jason Clark and his partner, Weon Lee, were driving their patrol car west on San Marino when they saw Mendez and a Hispanic companion run past them "in a full sprint." Chasing them was a single male Hispanic with blood on his fingers, who was later determined to be Pablo. Because the windows of their patrol car were rolled down, Clark and Lee heard Pablo yell out that "the two . . . [men he was] chasing had robbed him or beat him up." Lee, who was driving the patrol car, made a U-turn and followed Mendez and his companion. Although Mendez kept running east, his cohort changed direction and ran south, then turned a corner and ran north. When the officers lost sight of his partner, they focused on Mendez and continued to follow him.

Mendez made a sharp turn and ran into an open garage with a car parked inside. He then "laid down against the front bumper, as if trying to hide himself." Clark and Lee got out of their patrol car, approached Mendez and took him into custody.

3

After Pablo was interviewed with the aid of a Spanish speaking officer, Clark and Lee drove their patrol car down the street in search of Mendez's partner. They found the knife which had apparently been used during the confrontation between Pablo, Mendez and Mendez's companion on the "north side" of the street, near the sidewalk close to the intersection of San Marino and Irolo. After putting on gloves, Clark picked up the knife, placed it in a plastic bag and set it in the trunk of the patrol car.

b. *Defense evidence.*

Mendez testified on his own behalf. At approximately 11:30 a.m. on September 3, 2012, Mendez was walking down Irolo Street toward the bus stop. He had been visiting family friends and was on his way home. As he approached James M. Wood Street, two individuals ran past him. A third individual, who Mendez later identified as Pablo, then ran up to Mendez, stopped and began to yell at Mendez in Spanish. Mendez, who understands only a little Spanish, decided he was "going to get away from this person [and he did not] want any part of it." Mendez began to run away from Pablo, toward San Marino and his bus stop on Normandie.

As he ran past the intersection of Irolo and San Marino, Mendez spotted a police car. Although there appeared to be officers in the vehicle, Mendez "completely ignored them and kept going" until he reached Normandie. Although he had not had anything to do with the robbery of Pablo, Mendez had run past the police car because he had been "harassed by police officers several times" in the past and always seemed to be "profiled." He believed police officers "pick[ed] on [him] because of . . . the way [he] look[ed]."

Although he did not believe either Pablo or the police officers were following him, Mendez wished to get out of the area and he continued to run down Normandie, although he ran away from the direction of his bus stop. He had decided to make a loop back to his friend's house. At some point, however, he became too tired to continue. He crossed the street, entered an open parking lot and sat down next to a parked car. Approximately 45 seconds after he sat down, Mendez was approached by police officers and taken into custody.

4

2. *Procedural history.*

Following a preliminary hearing, an information was filed on October 10, 2012, in which Mendez was charged with one count of second degree robbery (§ 211), a violent felony pursuant to section 667.5, subdivision (c), and a serious felony within the meaning of section 1192.7, subdivision (c), making the offense a strike pursuant to the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  It was further alleged that, should Mendez be found guilty of the robbery, any sentence imposed was to be served in state prison pursuant to section 1170, subdivision (h)(3) in that, on August 9, 2007, he had suffered another strike, a juvenile adjudication which resulted in the finding he had committed robbery (§ 211).

On August 14, 2013, Mendez decided to proceed to trial on the matter.  A jury, including two alternates, was chosen and sworn the same day.  The trial court then granted Mendez's motion that the trial on the allegation he had suffered a juvenile adjudication which had resulted in a finding he committed robbery would be bifurcated from the trial on the robbery alleged to have occurred on September 3, 2012.

On August 16, 2013, after the prosecution had presented its evidence on the September 3 robbery, counsel for Mendez made a motion for the entry of a judgment of acquittal pursuant to section 1118.1, urging there had been insufficient evidence to prove the charge.  The trial court denied the motion.

After defense counsel then indicated it was likely Mendez was going to testify, the trial court and counsel considered whether it was appropriate to use a juvenile adjudication for purposes of impeachment.  Following a lengthy discussion, the People indicated they would not use the prior juvenile adjudication to impeach Mendez.  The trial court then addressed Mendez and stated:  "So let me just make sure we're all clear and make sure Mr. Mendez understands. . . .  [T]he People are not intending to ask you about a prior criminal proceeding.  So you don't need to worry about that, with one exception, which is . . . you could, as we call it, open the door.  You could say something that causes me to let him bring it up.  [¶]  So if you say, I've never been in trouble before or I've never done anything like this before, something to that effect, [we] could end up

5

with a situation where [the prosecutor] asks me to let him . . . ask you about the prior . . . adjudication. So I just want to make sure you understand that you need to stay away from something like that . . . ."

On August 19, 2013, Juror No. 2 was more than 30 minutes late and had failed to contact the court. The trial court decided to discharge the juror from the panel and replace her with alternate Juror No. 2.

After each party presented its case and made its arguments, the trial court gave to the jury final instructions. The jury then retired to the jury room to begin its deliberations at approximately 2:50 p.m. on August 19, 2013.

On the afternoon of the following day, August 20, 2013, the foreperson of the jury sent to the trial court a note indicating: "We, the Jury in the above-entitled action: would like to request all of the testimony from all three witnesses with direct and cross-examination." In response, the trial court wrote: "Please specify what portion of the testimony you are requesting from each witness." The foreperson then indicated the jurors "would like to request the testimony of [the] prosecutor's cross-examination of Mr. Mendez as to where they physically were when Mr. Pablo approached Mr. Mendez." In addition, the jury wished to hear "the defense attorney's cross-examination of Mr. Pablo when [counsel] questioned the witness about the physical attributes of the suspects." After it was agreed the court reporter could read the requested testimony to the jury in the jury room, she did so and the jury then resumed its deliberations.

At approximately 4:15 p.m., the jury notified the bailiff a unanimous verdict had been reached. When, at approximately 4:20 p.m., Mendez, both counsel and the alternate juror were present, the court clerk read the following verdict: "We, the jury, in the above-entitled action, find the defendant, Jonathan Abdiel Mendez, guilty of the crime of second-degree robbery upon Jaime Pablo, on or about September 3rd, 2012, in violation of . . . section 211, a felony, as charged in count 1 of the information." A polling of the jurors indicated each individual juror had reached this verdict. The trial on Mendez's prior adjudication and sentencing in the matter were then set for October 11, 2013.

6

At proceedings held on October 11, 2013, Mendez indicated he wished to simply admit his prior adjudication. After the trial court advised him of his right to a trial, his right to show he was under the age of 16 when the petition was sustained, his right to use the subpoena powers of the court to call witnesses on his behalf, his right to confront and cross-examine the witnesses against him and the right to remain silent, Mendez waived those rights and admitted he had a "sustained petition [from August 9, 2007] for violation of . . . section 211 for robbery . . . and that [he was] 17 [years old] at the time of [his] arrest." The trial court then found Mendez had "knowingly, freely, and voluntarily waived his right[s]," that the sustained petition was true and that it amounted to a strike pursuant to the Three Strikes law.

Defense counsel made a *Romero*[4] motion to have the prior adjudication stricken. After reviewing defense counsel's motion and sentencing memorandum as well as the People's sentencing memorandum, which was accompanied by attachments showing additional adjudications and convictions suffered by Mendez, the trial court quoted the most recent probation report. The report indicated: "[Mendez is] a gang member, and a threat to public safety. He is likely to reoffend and is neither suitable nor eligible for probation. A maximum prison sentence is the only appropriate sentence for the defendant in this case . . . ."

Defense counsel then argued Mendez's prior adjudication for robbery had occurred several years ago, in 2007, and that, during his childhood, Mendez had been addicted to methamphetamine. However, at the age of 19, he turned his life around. He is married and has a child. In addition, the People had included in their papers a number of arrests and charges, in particular several which involved violent behavior, which were never prosecuted. Finally, although at one time Mendez may have been a gang member, there was no evidence he still is.

The trial court denied the *Romero* motion. Taking into account the factors set forth in *People v. Williams* (1998) 17 Cal.4th 148, 161, the trial court indicated the

---

[4]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

7

present crime involved violence. Mendez grabbed the chain from Pablo's neck then hit Pablo in the head with his fist while his cohort threatened him with a knife and kicked him in the chest. In addition, Mendez lied during his testimony. If he had not, the jury would not have found him guilty. The trial court then referred to the "nature and circumstances" of Mendez's prior behavior. Although he may not always have been found guilty of the offenses, Mendez had a "long history of theft and violence," including an incident during which he robbed an individual by threatening her with a tire iron. With regard to the assertion he had "turned his life around," the trial court concluded his commission of the present offense "[did] not show that."

On November 8, 2013, the trial court sentenced Mendez to the midterm of three years in state prison, then doubled the term to six years pursuant to the Three Strikes law. With regard to restitution to the victim for his necklace, it was stipulated Mendez would pay Pablo $500 (§ 1202.4, subd. (f)). The trial court then awarded Mendez presentence custody credit for 432 days actually served and 15 percent, or 64 days, of good time/work time for a total of 496 days. Finally, the trial court ordered Mendez to pay a $240 restitution fine (§ 1202.4, subd. (b)), a stayed $240 parole revocation restitution fine (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment (Gov. Code, § 70373).

Mendez filed a timely notice of appeal from the judgment on January 6, 2014.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed June 10, 2014, the clerk of this court advised Mendez to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

8

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.